**Affirmed and Opinion filed November 1, 2018.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## NO. 14-18-00461-CV

## IN THE INTEREST OF Z.M.R. AND Z.D.B., CHILDREN

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2017-02402J**

## O P I N I O N

The trial court terminated the parent-child relationship between appellant P.S.R. (Mother) and her children, Zoe and Zachary.[1] Termination was based on Mother's irrevocable affidavit of relinquishment of her parental rights and the court's finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K), (b)(2) (West 2014 & Supp. 2017). The trial court appointed the Texas Department of Family and Protective Services (the Department) to be the children's managing conservator.

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

On appeal, Mother contends termination was improper because she executed the affidavit involuntarily and had ineffective assistance of counsel. She does not challenge the trial court's finding that termination of her parental rights is in the children's best interest, nor does she challenge the Department's appointment as managing conservator. We affirm the trial court's judgment.

## BACKGROUND

### A. Removal and pretrial proceedings

In April 2017, Mother brought then 11-month-old Zachary to Texas Children's Hospital, reporting he had swelling on his right side and was twitching when she picked him up. Examination of Zachary revealed multiple unexplained injuries, including: two skull fractures; ten bilateral rib fractures in different stages of healing; two toe fractures; a burn on his left arm consistent with a cigarette burn; and elevated liver enzymes, indicating an injury to the liver. Zoe, then three years old, showed no signs of injury or neglect. Zachary remained hospitalized, and Zoe was placed in a foster home.

The Department filed this suit for protection a few days later. The trial court appointed Michelle Bush as counsel for Mother and held a full adversary hearing, after which it ordered the children to be removed from Mother's care and named the Department as their temporary managing conservator. The court also signed an order requiring Mother to comply with any family service plan by the Department.

### B. Trial

Trial was held nearly a year after removal. Mother did not attend trial personally. Bush stated on the record that Mother had been in the courthouse earlier that day, at which time she had executed an irrevocable affidavit of relinquishment of her parental rights, then left. Bush said she had explained the affidavit to Mother,

Mother had no questions, Mother understood the affidavit and its consequences, Mother wanted to sign the affidavit, and nothing was promised to Mother in exchange for her signature. The trial court admitted the affidavit into evidence without objection.

Department caseworker Brittany Johnson testified about Zoe's and Zachary's progress since removal. They remained in the same foster-to-adopt home from removal until trial. She said they were doing "really, really well" in that home. Zoe, she said, is independent, loves helping take care of Zachary, and takes pride in making decisions for herself. Zachary struggled to walk when he entered foster care but mastered it with help from his foster mother. Johnson and the children's guardian ad litem, Linda Berlinger, agreed "one hundred percent" that termination of Mother's parental rights was in the children's best interest so they could be adopted by their foster parents.

The trial court found (1) Mother executed an unrevoked or irrevocable affidavit of relinquishment of her parental rights, and (2) termination of Mother's parental rights was in Zoe's and Zachary's best interest. The trial court appointed the Department to be the children's managing conservator.

### C.    Motion for new trial

Mother, through new counsel, filed a motion for new trial. The motion alleged "newly discovered evidence" had come to Mother's knowledge since the trial: namely, that Mother reportedly suffers from bipolar disorder, depression, and other mental health conditions and had not taken her prescribed medication for six years. As a result, Mother contended, her affidavit was involuntary.

The trial court held an oral hearing on the motion. Mother; her father, Paul[2];

---

[2] Paul is Mother's biological father. He did not know whether his parental rights had been terminated.

her grandmother, Mary; Johnson; and Berlinger testified at the hearing. Bush appeared at the hearing and examined every witness except Paul, but she was not called as a witness and did not testify. Mother offered certain records from the Mental Health Mental Retardation Authority of Harris County (MHMRA), which were admitted into evidence without objection.

### 1.    Mother's mental health and abilities

***Six years before relinquishment.*** The MHMRA records concern a 2012 evaluation of then-16-year-old Mother's mental health and mental abilities. With an IQ of 64, Mother was diagnosed with a mild intellectual disability. She read at a fourth-grade level. She "spoke in word phrases and simple sentences with minor articulation difficulties evident." Her receptive language skills were adequate, though "[c]larification of simple directives was sometimes necessary."

The evaluators noted Mother was verbal, ambulatory, and "independent in all areas of her daily living." Examples of such daily living included hygiene and self-grooming, household chores, staying home alone, and knowing how to respond in an emergency. Mother reportedly could handle small amounts of money and make simple purchases, but she could not manage money independently. She could not tell time.

Mother's medical history was described as unremarkable, but her mental health history was "significant for an Adjustment Disorder and physical abuse and neglect victimization." A victim of abuse and neglect as a child, Mother had been in Department custody off and on since she was 10 years old. She lived with a foster mother at the time of the evaluation. Her foster mother was said to be in the process of adopting Mother and Mother's younger sister. Mother was being treated with medication for adjustment disorder.

The evaluators deemed Mother eligible for intellectual disability services.

4

Available services included assistance for Mother and her foster mother in, for example, navigating the school system, accessing community resources, meeting people and making friends, learning money management, accessing medical or mental health care, learning basic living skills, obtaining or changing employment, modifying Mother's living environment, and exercising legal rights. Though eligible, Mother and her foster mother declined all services. The evaluators noted Mother indicated she felt happy in her foster home and at school and enjoyed her existing friendships and relationships.

*At the time of relinquishment.* Mother testified she left high school after 10th grade. She does not have a driver's license, she said, but she knows how to drive and use a GPS to navigate. She testified she receives disability income from the Social Security Administration and said she gave Johnson a copy of her social security award letter. Before she signed the affidavit of relinquishment, she had completed many of the services required by her family service plan, including submitting to a psychosocial assessment shortly after her children were removed. On cross-examination, the Department questioned Mother as to why the report of the psychosocial assessment indicated Mother reported she had no history of mental illness. Mother said she did not say that to the assessor.

Paul testified he told Bush that Mother had "a mental disorder" and did not understand the proceedings against her, so he should help Bush in explaining matters to Mother. He did not remember when he made that statement to Bush, only that it was during one of Mother's court appearances. Bush reportedly told him he could not be present when she and Mother were talking because Mother, who was facing a criminal charge regarding Zachary's injuries, might make a statement incriminating herself, and Paul could be compelled to testify as to that statement. Paul said he also told a previous caseworker about Mother's diminished abilities, but

admitted he did not share his concerns with Johnson, Berlinger, or the children's attorney ad litem. Paul did not know the MHMRA records existed or that Mother had undergone a mental health and mental abilities evaluation at age 16.

Johnson met with Mother many times throughout the pendency of this case. She said Mother did not tell her she had an intellectual disability, and Johnson did not know. Mother reportedly told Johnson she had attention hyperactivity deficit disorder (ADHD). Sometimes Mother would tell her she did not understand what Johnson was saying. On those occasions, Johnson continued to talk with Mother until she said she understood. Johnson estimated Mother was evaluated or treated by three mental health professionals. None of them expressed any concern to Johnson regarding Mother's ability to understand and participate in the process.

Berlinger also talked with Mother several times throughout the case. She believed Mother understood what was happening, and Mother never gave her reason to believe she did not understand.

### 2. Circumstances surrounding execution of affidavit

All the witnesses except Paul offered an account of the circumstances surrounding Mother's execution of the affidavit of relinquishment. Mother testified Bush told her she would be a "dumb ass" if she did not sign the affidavit. She did not understand what the affidavit meant, Mother said, but she knew it was important because a notary and two witnesses were with her when she signed it. Still, she did not read it or ask for it to be read to her. Mary was not with Mother at the time of signing, but she testified Mother called her, crying. According to Mary, Mother indicated she felt pressured to sign the affidavit. Mary said she advised Mother not to sign it. Mother said she signed the affidavit because she was scared and:

> I wanted them to leave me alone. I wanted to be done with it. I just signed it. . . . I wasn't thinking straight. I just wanted to leave. I wanted

6

to get away.

She said she never would have signed the affidavit had she understood its consequences.

On cross-examination, Mother admitted she and Bush spoke on the phone multiple times throughout the case. She had Bush's phone number and knew she could call or text Bush. Mother also acknowledged Bush attended every court hearing with Mother and met with Mother before each hearing to discuss the case, including her positive drug test results and the fact of her pending criminal charges. Bush asked if Mother remembered discussing the possibility of relinquishment at a hearing about seven months before trial, but Mother denied any memory.

Johnson and Berlinger told a different story. Johnson was not with Mother at the time she signed the affidavit of relinquishment but had been with her earlier in the day. She said Mother was not upset when she saw her. Further, Mother had brought a fictive kin with her for the Department to evaluate as a possible placement for the children.

Berlinger testified in detail about Mother's execution of the affidavit:

Q:     Can you describe to us what you saw, what you heard, how that went down?

A.     Yes, ma'am. You guys had the papers, they were draped over a trash can. And you were explaining very carefully section by section what she was signing.

Q.     And at that point, when you saw me explaining the documents to her, was Mom upset or crying?

A.     She was upset, yes.

Q.     Okay. Was she able to listen to what I was telling her?

A.     Yes.

Q. Was she also standing there with one other family member?

A. Yes.

Q. The [children's] grandmother, correct?

A. Yes.

. . .

Q. And was the grandmother calm in listening to what I had to say?

A. I don't recall. I was watching [Mother].

Q. Okay. Okay. At any time did you hear me use any profanity or threaten or bad words at all towards the mom?

A. No.

Q. Towards anybody?

A. No.

Q. Okay. Were you there when Mom signed the document?

A. Yes.

Q. Did you hear me ask her, are you signing this because this is what you think is best for your children?

A. Yes.

Q. And her response was?

A. Yes.

Q. And did you hear me ask her, is anybody forcing you to sign this or promising you anything to sign this?

A. You asked that, yes.

Q. And was her response –

A. Yes.

8

Q. – no, I'm not being forced and no, I'm not being promised anything?

A. Yes.

Q. Did you have any concerns, being the Child Advocate, best interest of the child as well as the interest of the mother, that anything to harm the mother in anyway [sic] was happening out there?

A. I had no concerns.

Q. And do you believe, based on what you saw and based on your conversations with Mom throughout the year of this case, that Mom had the intellectual capacity to understand what she was doing by signing that relinquishment?

A. Yes.

Q. And do you believe that she was upset because she was giving up her rights to her children, correct?

A. Yes. Exactly.

Q. But you also – did you believe that she understood, based on the circumstances that she was in, that that's why she was doing it? That that's why she was relinquishing?

A. Yes. She understood that – the consequences of not relinquishing, that her chances at trial were not good. And that if her rights were terminated that she would have the consequences of the further children being taken away.

The trial court then asked Berlinger if she thought relinquishment was the appropriate result in this case, and Berlinger said yes:

The Court: From your perspective. Child Advocate representative. But I know that you also focus on trying to help the mothers along, particularly, you know, a young mother like her. . . . Would you think that what she did in signing that relinquishment under the circumstances was the appropriate thing for that mother?

9

Berlinger:    Yes.

The Court:    I mean based on what she was looking at and the prospects that she had. You had mentioned that, you know, it didn't look particularly good to you, as far as the facts or possible outcomes. So you feel like signing the relinquishment was something that maybe you would have even recommended?

Berlinger:    I would have, yes.

The Court:    Okay.

Berlinger:    I would have. Absolutely.

The Court:    If that relinquishment seemed improper, would you have spoken up and said, hey look –

Berlinger:    Yes, I would have.

The Court:    Okay. I just want to make sure.

Berlinger:    I absolutely would have. Yes.

The trial court also questioned Mother. She confirmed she understood, at the time she signed the affidavit and as she sat in court that day, the difference in consequences between a termination based on relinquishment and a termination based on a finding of endangerment:

The Court:    . . . . You're a very young person, right? How old are you?

Mother:    I'm 22.

The Court:    Twenty-two. Okay. And it was explained to you that relinquishing your rights, you give up your rights to child or children but if you have other children in the future, you get to start over. They don't hold that against you.

Mother:    She told me that.

The Court:    Okay. . . . But then if you went to trial and had your rights terminated for not doing good things –

10

Mother:     She told me that.

The Court:  – then every other time you have a child, they would be – that CPS could pick them up and terminate your rights. You understand that, right?

Mother:     Yes.

The Court:  Okay. So if you signed a relinquishment, at least one of the – one of the good things, even though it's difficult for you, one of the good things would be that, I guess the relinquishment, in a sense means, well I was young. I made some mistakes but don't penalize me in the future when I have future children. That's one of the benefits of a relinquishment, right?

Mother:     Yes.

The Court:  And you understood that, right?

Mother:     Yes. Now can I speak?

The Court:  Okay. But I mean if you go to trial, and I don't know exactly what your facts are in your case, but if you went to trial and the Judge or jury terminated your rights, that would cause problems for you if you had another child in the future, right?

Mother:     Yes.

The Court:  And you understand all that?

Mother:     Yes.

The Court:  All right. Just want to make sure you understood. That's a very significant thing for you to understand.

### 3.    Ruling

After hearing closing arguments, the trial court orally denied Mother's motion for new trial.

ANALYSIS

## I.     Relinquishment

Mother words her issue on appeal as simply "Ineffective Assistance of Counsel." Though her brief is less than clear, she also appears to be raising a second issue, which is that her diminished mental capacity rendered her relinquishment involuntary. We will address that issue first.

### A.     Legal standards

Parental rights can be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2) (West Supp. 2017). One such act is "execut[ion] before or after the suit is filed [of] an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by" Family Code chapter 161. *Id.* § 161.001(b)(1)(K).

An affidavit of relinquishment of parental rights, in turn, is governed by section 161.003. The Supreme Court of Texas described section 161.003 as follows:

> Reflecting the grave significance of [relinquishment], Family Code section 161.103 includes 28 subparts. The statute requires, among other elements for a valid affidavit: (1) a waiting period after birth; (2) two witnesses; (3) verification by the parent that termination of the parent-child relationship is in the child's best interest; (4) designation of the person or agency to serve as the child's managing conservator; (5) a statement that the parent has been informed of parental rights and duties; and (6) a statement that the termination is irrevocable if that is (as here) the case.

*In re K.S.L.*, 538 S.W.3d 107, 109–10 (Tex. 2017).

The proponent of the affidavit—here, the Department—has the burden to prove the elements necessary to support termination of the parent-child relationship. *In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014). Section 161.103(a) requires that the

affidavit be for voluntary relinquishment, and implicit in section 161.001(1)(K) is the requirement that the affidavit of parental rights be voluntarily executed. *Id.* An involuntarily executed affidavit is a complete defense to a termination suit based on section 161.001(1)(K). *Id.*

An affidavit of relinquishment in proper form constitutes prima facie evidence of its validity. *In re A.L.H.*, 468 S.W.3d 738, 741 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Once the proponent of the affidavit meets the burden, the party opposing the affidavit must show its execution resulted from fraud, duress, or coercion. *In re R.P.R.*, No. 14-17-00760-CV, 2018 WL 1097298, at *3 (Tex. App.—Houston [14th Dist.] Mar. 1, 2018, pet. denied) (mem. op.). Mother does not contend the affidavit failed to comply with section 161.003.

Section 161.211 of the Family Code, entitled "Direct or Collateral Attack on Termination Order," governs challenges to termination orders based on an unrevoked affidavit of relinquishment. Tex. Fam. Code Ann. § 161.211 (West 2014). Section 161.211(c) states:

> A direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of waiver of interest in a child is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit.

*Id.* § 161.211(c).

### B. Application

*In re K.M.L.* also involved a mother with an intellectual disability who contended her affidavit of relinquishment was involuntary. The jury found the relinquishment was voluntary, and the court of appeals affirmed, but the Texas Supreme Court concluded the evidence of voluntariness was legally insufficient. *K.M.L.*, 443 S.W.3d at 104–05.

13

The mother, Melissa, was diagnosed with bipolar disorder and borderline intellectual functioning. Her IQ was below 70, and she read at a second-grade level. *Id.* at 113–14. Melissa had her daughter, whom we will call Kate, at age 18. *Id.* at 105. Kate fell down the stairs accidentally when she was two years old. The Department removed her from Melissa's care and petitioned for termination of Melissa's parental rights. *Id.*

About nine months into the termination suit, Melissa executed an affidavit of relinquishment of her parental rights to Kate. *Id.* at 106. Melissa mistakenly believed the affidavit would allow her mother, Angali, to obtain custody of and adopt Kate. *Id.* Soon after she executed the affidavit, she unsuccessfully sought to revoke it. *Id.* Trial began seven months later. *Id.*

At trial, Melissa continued to challenge her affidavit as involuntarily executed. She cited two facts to support her claim that she did not understand the effect of the affidavit. First, Melissa and Angali, on the incorrect advice of a lawyer, had twice executed documents by which they attempted to transfer custody of Kate from Melissa to Angali. *See id.* at 105, 114. Though the documents were legally ineffective, Melissa's intent was clear: she had an "earnest desire to enable [Angali] to help care for [Kate] while Melissa remained part of [Kate's] life." *Id.* at 114. Second, about six weeks after Melissa executed the affidavit of relinquishment, a court in an unrelated matter determined Melissa was incapable of managing her own affairs due to her intellectual disability and mental illness. *See id.* at 106, 113. That court appointed Angali to be Melissa's guardian. *Id.* at 106.

Several witnesses testified about Melissa's lack of comprehension. Her psychiatrist testified there was "no way" Melissa understood the affidavit she signed. *Id.* at 113. Her counselor testified Melissa struggled at times to understand. With time and due to the rapport she had built with Melissa, the counselor could ensure

Melissa eventually grasped certain concepts. *Id.* Still, the counselor testified, Melissa never got "settled" or "rooted" with the idea that she would not see Kate again. Furthermore, on the day of the hearing regarding the affidavit of relinquishment, Melissa reportedly could not hear what was being said and did not understand what she did hear. *Id.* at 114. Melissa's former lawyer testified even he was confused about the events that occurred the day Melissa signed the affidavit. *Id.*

The evidence in this case is considerably different from that in *K.M.L.* First, Melissa signed her affidavit seven months before trial, and sought to revoke it almost immediately thereafter. *Id.* at 106. The issue of voluntariness was fully litigated at trial. *See id.* at 113–15. In this case, by contrast, Mother signed her affidavit on the day of trial. The final judgment of termination was signed a month later, and another month elapsed before Mother filed a motion for new trial. Only then, two months after she signed the affidavit, did she allege her relinquishment was involuntary.

Second, the record in *K.M.L.* contained several pieces of evidence about Melissa's mental abilities around the time she signed the affidavit of relinquishment. Her psychiatrist and counselor both testified as to her comprehension challenges throughout the case. *See id.* at 113–14. Six weeks after she signed the affidavit, a court found Melissa incompetent to manage her own affairs and appointed a guardian for her, an appointment from which one may reasonably infer she might not have been competent to execute the affidavit. *Id.* at 113. But here, most of the evidence of Mother's mental abilities came from the MHMRA records, which concern an evaluation conducted five years before this case began and six years before relinquishment. The only evidence of Mother's current mental abilities was Mother's own say-so and the testimony of Paul and Mary, her relatives. As fact finder, the trial judge was the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*,

209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003). The trial judge was free to disbelieve the interested testimony of Paul and Mary. Further, the lack of certain evidence in this case is significant—namely, that none of Mother's former laywer, the caseworker, the children's guardian ad litem, or any of three mental health professionals who had evaluated or treated Mother expressed concerns about her ability to understand.

Finally, in *K.M.L.* there was "absolutely no evidence in the record, other than the language of the affidavit itself," that Melissa understood the consequences of signing the affidavit of relinquishment. *Id.* at 115. In this case, though, several pieces of evidence show Mother understood the effect of the affidavit:

- Her trial lawyer, Bush, stated on the record at trial that she had explained the affidavit to Mother, Mother understood the affidavit and wanted to sign it, and nothing was promised to Mother.

- The caseworker, Johnson, testified Mother brought someone with her to court for the Department to evaluate as a placement for the children. The fact finder could reasonably infer Mother understood she would be giving up her rights to the children and wanted the Department to appoint someone she knew as the their managing conservator.

- The children's guardian ad litem, Berlinger, testified in detail about Mother's execution of the affidavit, specifically noting Mother appeared to understand what she was doing.

- Mother engaged in a long discussion with the trial judge in which she confirmed she understood, both when she signed the affidavit and at the hearing, the benefits of relinquishment over termination on another ground.

As with the evidence of Mother's current mental abilities generally, the only evidence that Mother did not understand the affidavit, besides her own testimony, came from her father and her grandmother—neither of whom was present when she

16

signed the affidavit. Again, the trial judge was free to believe the accounts of Bush, Johnson, and Berlinger over those of Mother, Paul, and Mary.

Mother testified she felt pressured to sign the affidavit, asserting Bush said she was a "dumb ass" if she did not sign it. Berlinger testified she did not hear Bush use that or any other derogatory language. Instead, Berlinger said, Bush explained each section of the affidavit to Mother. Berlinger also said she heard Bush ask Mother if she was signing the affidavit because she thought doing so was in the best interest of her children and not because of pressure or promises, and she heard Mother say yes. Feeling pressured to sign an affidavit of relinquishment does not rise to the level of duress or coercion. *E.g.*, *In re J.H.*, 486 S.W.3d 190, 195–97 (Tex. App.—Dallas 2016, no pet.); *In re D.E.H.*, 301 S.W.3d 825, 830 (Tex. App.—Fort Worth 2009, pet. denied).

We conclude Mother has not shown on appeal that her affidavit of relinquishment resulted from fraud, duress, or coercion.

## II. Ineffective assistance of counsel

### A. Legal standards

Indigent parents in Texas parental-termination cases enjoy a right to appointed and effective counsel. *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). We apply the established *Strickland* test in parental-termination proceedings. *Id.* at 545 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Under *Strickland*, to establish an ineffective-assistance claim, an appellant must show the following:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a

17

fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. In other words, a parent must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the parent's case. *M.S.*, 115 S.W.3d at 545.

To determine whether representation was deficient, we must consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *Id.* In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it" will we find such performance deficient. *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *M.S.*, 115 S.W.3d at 550. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, the parent must also show that "counsel's deficient performance prejudiced the defense." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *Strickland*, 466 U.S. at 687).

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions. *Id.*

## B.     Application

### 1.     Waiver

Relying on *In re K.A.F.*, 160 S.W.3d 923 (Tex. 2005), the Department contends Mother waived her ineffective-assistance arguments because she did not raise them in her motion for new trial or at the hearing on her motion. The *K.A.F.* court held a parent who did not raise ineffective assistance of trial counsel as an issue in the court of appeals could not raise it for the first time in the Texas Supreme Court. *Id.* at 928. The Department analogizes that Mother's new lawyer was obliged to raise the ineffective-assistance argument concerning her previous lawyer at the first opportunity, which was the motion for new trial.

We disagree. A complaint of ineffective assistance of counsel may be raised for the first time on direct appeal. *See J.O.A.*, 283 S.W.3d at 340. A motion for new trial can be useful because it allows the complaining party to develop a record to support his complaint. However, the Department has not directed us to any authority suggesting a motion for new trial is a prerequisite to preserve error on ineffective assistance of counsel. The appellant may be unsuccessful in that complaint if the record below is not sufficiently developed, but the lack of merit in the complaint is distinct from the appellant's right to assert the complaint.

### 2.     MHMRA records

Mother contends Bush provided her ineffective assistance of counsel by "fail[ing] to investigate fully the mental capacity of [Mother] so as to be certain that [Mother] knew the effects of the signing of a voluntary relinquishment of her parental rights to her children." Mother appears to base her contention on the fact that Bush did not obtain the MHMRA records. Mother does not explain how Bush should have known to look for those records when the evidence suggests Mother herself denied any history of mental illness.

19

In any event, the MHMRA records reveal information about Mother's mental health and abilities in 2012. They do not speak to her mental abilities at the time of removal, throughout this case, or when Mother signed the affidavit of relinquishment. Evidence about Mother's mental abilities at those times came from multiple witnesses, most of whom testified Mother seemed to understand all relevant information. The trial judge questioned Mother at length about whether she understood the consequences of termination based on relinquishment as opposed to another ground, and Mother repeatedly confirmed her understanding. Given the other evidence concerning Mother's mental capacity, we cannot say Bush's not obtaining the MHMRA records was "so outrageous that no competent attorney would have engaged in it." *M.S.*, 115 S.W.3d at 545.

Because Mother has not satisfied the first prong of the *Strickland* test (deficient performance), we need not consider the second prong (prejudice). *Garcia*, 57 S.W.3d at 440.

## CONCLUSION

We overrule Mother's issues and affirm the trial court's judgment.

/s/    Tracy Christopher
        Justice

Panel consists of Justices Christopher, Jamison, and Brown.