**AFFIRMED and Opinion Filed February 14, 2023**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-22-00954-CV**

_____

**IN THE INTEREST OF T.J., W.J. AND T.J., CHILDREN**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-30035-2021**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Garcia, and Breedlove
Opinion by Justice Garcia

The trial court terminated the parent–child relationships between appellant (Mother) and three teenaged children. Mother appeals, raising six issues. We affirm.

### I.  BACKGROUND

This case began in March 2021 when the Texas Department of Family and Protective Services filed its Original Petition in Suit Affecting the Parent–Child Relationship—Temporary Managing Conservatorship. The Department sought to be appointed temporary managing conservator of three children: T.J. (Older Daughter), who was born in 2005; W.J. (Son), who was born in 2006; and T.J. (Younger Daughter), who was born in 2007. The petition was supported with an attached

affidavit regarding Department investigations into the family in late 2020 and early 2021. According to the affidavit, the Department received information suggesting the following facts:

1. the children lived with their maternal grandmother (Grandmother) and were physically abused by Grandmother and by Grandmother's brother (Granduncle);

2. in May 2020, Older Daughter ran away from Grandmother's home after an episode of physical abuse and had been living with a family friend, I.W., ever since;

3. Son suffered from poorly controlled diabetes and suicidal ideations;

4. Father had had no contact with the children since Younger Daughter's infancy; and

5. Mother had little contact with the children involved in this case, but from 2009 to the present she had repeated contacts with the Department concerning alleged neglect or abuse of her other, younger children (who are not involved in this case).

The trial judge appointed an attorney ad litem for Mother.

The children's maternal grandmother (Grandmother) answered and filed a counter-petition in which she sought to be named the children's sole managing conservator.

In April 2021, the Department filed a first amended petition that added a request for emergency relief as to Son. That same day, the trial judge signed an ex parte temporary order appointing the Department as Son's temporary managing conservator.

The children's father (Father) filed an answer.

After a hearing held on April 20, 2021, the trial judge signed a temporary order appointing the Department as temporary managing conservator of all three children and placing the children in I.W.' s home. Mother did not appear at the hearing.

In May 2021, Mother's attorney ad litem filed an answer on Mother's behalf.

After a hearing held on May 25, 2021, the trial judge signed a status hearing order that imposed several requirements on Mother, such as participating in random drug and alcohol tests, maintaining stable housing, and maintaining stable employment.

In September 2021, the Department filed a second amended petition. In this pleading, the Department asked the trial court to remove Grandmother as a conservator of the children and to terminate Mother's parental rights. Grandmother was later removed as a conservator through an agreed interlocutory order.

In February 2022, the case was tried without a jury in one day. Mother did not appear at trial, but her attorney ad litem did. Father appeared in person and with counsel. Several witnesses, including Father, testified.

On September 6, 2022, the trial judge signed a final order that terminated the parent–child relationship between Mother and the three children involved in this case. In that order, the judge found by clear and convincing evidence that Mother committed the conduct specified in § 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. The judge further appointed the Department as the children's non-

parent permanent managing conservator and appointed Father as parent possessory conservator.

Mother timely appealed the final order.

The State has not filed an appellate brief.

## II.    ISSUES ON APPEAL

Mother raises six issues on appeal.

In her first three issues, she urges that the evidence is legally and factually insufficient to support the essential elements necessary to terminate her parent–child relationships with the children.

In her fourth issue, she argues that the Department violated her rights by failing to prioritize and provide services toward reunifying her with the children.

In her fifth issue, she argues that she was not given an adequate opportunity to appear at trial to defend herself, and that any failure to preserve this issue for appeal amounts to ineffective assistance of counsel.

In her sixth issue, she argues that she was wrongfully prohibited from appearing at trial.

## III.    SUFFICIENCY OF THE EVIDENCE

We address Mother's first three issues together.

## A.    Standard of Review

Because terminating parental rights implicates fundamental interests, the clear and convincing standard of proof applies at trial in termination cases. *In re A.B.*,

437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the allegations to be established. TEX. FAM. CODE ANN. § 101.007.

Our standards of review reflect the elevated burden of proof at trial. *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). Under both legal- and factual-sufficiency standards, we consider all the evidence, defer to the factfinder's determinations as to witness credibility, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.*; *see also In re A.B.*, 437 S.W.3d at 503 (describing the factfinder as "the sole arbiter when assessing the credibility and demeanor of witnesses"). The distinction between the two standards lies in the extent to which we may consider disputed evidence contrary to a finding. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In a legal-sufficiency review, we credit evidence that supports the finding if a reasonable factfinder could have done so, and we disregard contrary evidence unless a reasonable factfinder could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). However, we do not disregard undisputed facts that do not support the finding. *Id.* at 113. Even evidence that does more than raise surmise and suspicion will not suffice as clear and convincing unless it can produce a firm belief or

conviction that the allegation is true. *Id*. If no reasonable factfinder could form a firm belief or conviction that the allegation is true, the evidence is legally insufficient. *Id*.

In factual-sufficiency review, by contrast, we must weigh disputed evidence contrary to the finding against all the evidence that supports the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. (footnote omitted). That is, evidence is factually insufficient if "the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction" that the finding was true. *In re R.W.*, No. 05-21-01158-CV, 2022 WL 2236087, at *3 (Tex. App.—Dallas June 22, 2022, no pet.) (mem. op.).

Although our review must be "exacting," in light of the constitutional interests at stake, it must not be so rigorous as to require, in effect, proof beyond a reasonable doubt. *In re S.M.G.*, No. 05-19-01084-CV, 2020 WL 1074580, at *2 (Tex. App.—Dallas Mar. 6, 2020, no pet.) (mem. op.).

**B.      Issues One and Two: The Findings Under § 161.001(b)(1)(D), (E), and (O)**

In issue one, Mother challenges the trial judge's finding under Family Code § 161.001(b)(1)(O). In issue two, she challenges the trial judge's findings under § 161.001(b)(1)(D) and (E).

We must review Mother's sufficiency challenges of the trial judge's findings that she committed the conduct described in Family Code § 161.001(b)(1)(D) and (E) even if the evidence is sufficient to uphold the judge's finding under § 161.001(b)(1)(O). *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam). Accordingly, we address Mother's second issue first.

### 1. Applicable Law

A court may terminate a parent–child relationship upon a finding by clear and convincing evidence that (1) the parent engaged in conduct described by § 161.001(b)(1) of the Family Code and (2) termination is in the best interest of the child. FAM. § 161.001(b).

Section 161.001(b)(1)(D) authorizes termination upon clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id*. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) authorizes termination upon clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(b)(1)(E). In these provisions, "endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health. *In re R.B.*, No. 05-21-00043-CV, 2021 WL 2943927, at *7 (Tex. App.—Dallas July 9, 2021, no pet.) (mem. op.).

Our opinion in *In re R.B.* summarizes the state of the law under subsection (D) and (E):

- Subsection (D) addresses the child's surroundings and environment, while subsection (E) addresses parental misconduct. However, parental conduct is relevant to the child's environment under subsection (D). *Id*.

- Termination of parental rights under subsection (D) can be based on a single act or omission. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id*. at *8.

- Under both subsections, the trial court may consider endangering conduct that occurred before and after the child's birth and conduct that occurred in and out of the child's presence. *Id*.

- Under subsection (E), the trial court may consider events that occurred after the child is removed by the Department. *Id*. at *8–9.

- It is not necessary for conduct to be directed at the child or for the child to actually suffer injury for endangerment to exist. "A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id*. at *9. (citation omitted).

### 2. Review of the Relevant Evidence

### a. Evidence Regarding the Children's Early Lives

Evidence showed that Older Daughter was born in late 2005, Son was born in late 2006, and Younger Daughter was born in late 2007. Father testified that he did not see the children from 2007 to 2020, and that he was incarcerated from about 2012 to 2017. According to Department investigator Chinequa Baker's affidavit, which was admitted into evidence, Father told Baker that Mother and Grandmother

hid the children from him and that he was not allowed to have any contact with the children. Baker's affidavit also stated that in 2020, during Baker's investigation, Grandmother told Baker that Grandmother had raised the children from the time they were babies.

The Baker affidavit and testimony by a CPS family-based safety worker indicate that Mother had three more children after 2007. These children were not involved in this case. However, the Baker affidavit reflects that Mother had several CPS referrals concerning abuse or neglect of these children from 2009 to April 2021.

The evidence reflects that the three children involved in this case were involved in a prior suit affecting parent–child relationship (SAPCR) filed in 2013. A certified copy of a 2014 court order in that case was admitted into evidence at trial. This order established Father's paternity of the three children, appointed Mother and Grandmother as the children's joint managing conservators, and gave Grandmother the exclusive right to designate the children's primary residence. Father was incarcerated during this SAPCR, and he testified that he did not recall getting any court papers while he was incarcerated.

b.     **Evidence Regarding Abuse and Neglect of the Children**

According to the Baker affidavit, the Department got involved with the children in this case in October 2020 because Son's school reported that Son had to be taken to the hospital from the school for a serious diabetes-related health episode and the school was unable to contact Grandmother. In December 2020, the school

informed Baker that Son's health problems had continued and that Son had been hospitalized because of a suicide attempt. Grandmother confirmed to Baker that Son was in the hospital because he had tried to commit suicide by overdosing on insulin.

According to the Baker affidavit, her investigation of the case after Son's suicide attempt and hospitalization brought many new facts to light. Son told Baker that in May 2020, Older Daughter had gotten into a fight with Grandmother and that Granduncle had gotten involved and beaten Older Daughter. Son further said that Older Daughter fled the house and had been staying with a family friend ever since. Son further reported other abuse and neglect. He said that Granduncle had exposed his genitals to Son and asked Son, "[D]oes this make your dick hard?" He also said that Grandmother beat him and his sisters with an extension cord. And he said that Grandmother did not provide him and his sisters with clothing or shoes, and they had to wear the same clothes year after year.

Additionally, Son's medical records from November 2020 show that he answered "Yes" to the following questions:

> 1. Did a parent or other adult in the household often … Swear at you, insult you, put you down, or humiliate you? or Act in a way that made you afraid that you might be physically hurt?
>
> 2. Did a parent or other adult in the household often … Push, grab, slap, or throw something at you? or Ever hit you so hard that you had marks or were injured?
>
> . . . .
>
> 5. Did you often feel that … You didn't have enough to eat, had to wear dirty clothes, and had no one to protect you? or Your parents were

–10–

too drunk or high to take care of you or take you to the doctor if you needed it?

. . . .

7.     Was one of your caregivers: Often pushed, grabbed, slapped, or had something thrown at her? or Sometimes or often kicked, bitten, hit with a fist, or hit with something hard? or Ever repeatedly hit over at least a few minutes or threatened with a gun or knife?

Another November 2020 medical record, however, states that Son denied any history of abuse or threats from family members. A December 2020 medical record states that Son reported that on one occasion two years prior, Granduncle "punched him in the head, arms and stomach," and on another occasion Granduncle "put a knife to his chest" and the scar eventually went away. A January 2021 medical record states that a clinician met with Grandmother and that "[Grandmother] reported about the incident with [Son] and her brother who emotionally abused him and exposed himself to him."

Baker further said in her affidavit that she wrote a safety plan for Grandmother and that Grandmother agreed not to let Granduncle in the house when the children were present. But later in December 2020, Son told Baker that Granduncle was still coming to the house and was being abusive to him and Younger Daughter. In late January 2021, Baker met with the children, Grandmother, and I.W., with whom Older Daughter had been living with since May 2020. During this visit, Younger Daughter said that Granduncle was still coming to the house, that he was verbally

abusive, and that she and Son were afraid. A few days later, I.W. agreed to let all three children stay with her.

Baker's affidavit also said that in February 2021, Older Daughter made an outcry of sexual abuse, claiming that she had been sexually abused by Mother's boyfriend and by Granduncle. Baker testified at trial that she learned, after forensic interviews, that Older Daughter said that Granduncle "had actually penetrated her" and "had actually been physically assaultive towards her." Baker also testified that her "remembrance right now" was that Younger Daughter had also made some disclosure that Granduncle had been "sexually inappropriate with her" and "there may have been some digital penetration" involving Younger Daughter. The alleged sexual abuse took place in Grandmother's home, where the children were living.

According to Older Daughter's medical records from June 2021, Older Daughter reported "sexual abuse from uncle from the age of 4 to the age of 14."

Clinical psychologist Laura Hastings testified that she interviewed all three children in January 2021. Older Daughter reported sexual abuse by Granduncle and long-time physical abuse in Grandmother's home. Younger Daughter disclosed corporal punishment that sounded like abuse, although she did not view it as abuse. Son alleged sexual harassment by Granduncle. All three children said that Mother was essentially not involved in their lives. Older Daughter said that she had seen Mother "only a few times a year." Son said that he had seen Mother "only a couple

[of] times in his life." Younger Daughter said that she saw Mother "about once a year."

Dr. Hastings's records from January 29, 2021, were admitted into evidence. According to those records, "[Older Daughter] reported her uncle touched her and made her touch him. [Older Daughter] reported this happened for years. . . . When asked about the nature and extent of the alleged sexual abuse by her uncle, [Older Daughter] was not clear. When asked whether her uncle was raping her, [Older Daughter] said yes." The records also state, "[Older Daughter] stated the alleged sexual abuse typically happened every other day when her uncle was staying at her house. [Older Daughter] added, 'he used to stay there for months.'" Finally, "[Older Daughter] reported that her grandmother still had her uncle come to the house after she lied and said [Older Daughter's] uncle was gone."

### c.    Other Evidence Regarding Mother and Her Conduct

Father testified that Mother has indicated to him that she was abused by Granduncle. When asked what Mother told him about that abuse, Father testified:

> She would conversate with me about sexual assaults that happened when she was younger about how she was adopted and stuff like that. Just different things—sexual assault, physical assault—while [Grandmother] stood by and watched.

Rebecca McKenzie was a CPS family-based safety worker who was assigned to Mother's other CPS case involving her other, younger children. She testified that she got that case in 2020 and it closed in April 2021. CPS recommended that Mother participate in a mental-health evaluation because she had previously been on

medication "for bipolar," but she went off her medication due to a pregnancy. Mother never obtained mental-health treatment during the case.

Baker testified that Mother was offered contact with the children while Baker's investigation was ongoing, but no visits occurred. Mother never spoke to Baker, "outside of calling [her] a name or two." Baker never got a "solid answer" about the nature of Mother's relationship with Grandmother. The children did not talk to Baker about how their occasional pre-removal visits with Mother went.

Lawonta Austin was the initial CPS conservatorship worker for the children in this case and was on the case until September 2021. She developed service plans for the parents and thought that they were emailed to the parents' attorneys. She attempted to find out whether Mother worked on her services and she was unable to verify completion of any of her court-ordered services. Austin asked the children every month about having visits with Mother, and they never chose to have such visits. Mother contacted Austin twice seeking visits with the children. Additionally, after the children were placed with I.W., I.W. told Austin that Mother was trying to contact the children through social media despite the court's ordering Mother to have all contact through the Department.

Claudia Bernal was the conservatorship worker on the case from September 2021 through January 2022. Regarding Mother's services, Bernal testified that an entity called Mother Focus contacted Bernal and notified her that Mother was not attending and that Mother Focus was unable to contact Mother. Twice, Mother

started attending Mother Focus classes and then stopped going. Bernal sent Mother a referral for a psychological evaluation with Dr. Hastings, but "she was never able to get her in the books." Mother never submitted to a drug test while Bernal had the case, nor did she provide Bernal with proof of employment. The children never mentioned Mother to Bernal while she was on the case. Mother never asked Bernal to set up a visit with the children.

Victoria Ford became the conservatorship worker on the case shortly before the trial, which occurred February 21, 2022. She testified that her understanding was that Mother was living with Grandmother. She thought that Mother had started "Motherhood Focus" on February 3 and then missed the next two classes.

Kristin Gile was the Court Appointed Special Advocate (CASA) for Son. She testified that she was assigned the case in April 2021, that she attempted to contact Mother every month, and that Mother responded only twice. Mother told Gile that she was doing Mother Focus classes, but she did not say why she was not doing her other services. The day before trial, Mother told Gile that she wanted the children to be with her, but to Gile's knowledge Mother had not completed all of her services.

### 3. The Evidence Is Sufficient to Support the Subsection (E) Finding

Mother argues that the evidence is legally and factually insufficient to support the finding that she endangered the children's physical or emotional well-being or knowingly placed the children with people who thus endangered them. Specifically, she argues that there is little to no evidence that Mother knowingly endangered the

children by leaving them with Grandmother. She also argues that the evidence that Mother knew or should have known that Granduncle was staying with Grandmother and would abuse the children was nothing more than speculation and hearsay.

We reject Mother's position.

### a. Knowingly Placing the Children with People Who Endangered Them

We conclude that there is sufficient evidence that Mother knowingly placed the children with someone—Grandmother—who engaged in conduct that endangered the children's physical or emotional wellbeing. *See* FAM. § 161.001(b)(1)(E).

Father testified that Mother told him (1) that Mother was abused by Granduncle and (2) that Mother was subjected to sexual assault and physical abuse while Grandmother "stood by and watched." And ample, undisputed evidence shows that Mother essentially abandoned all three children to Grandmother's care when the children were very young, having only sporadic visits with the children after that. Thus, even if there is no evidence that Mother knew that Granduncle was staying with Grandmother at least some of the time after Mother left the children in Grandmother's care, there is evidence that Mother knew that Grandmother was an

unsafe caregiver who had done nothing to protect Mother from sexual and physical abuse.[1]

Thus, we conclude that the evidence is sufficient to support the premise that Mother knowingly placed the children with someone who endangered them.

### b. Endangering the Children Herself

Moreover, the evidence is sufficient to support a finding that Mother herself endangered the children. *See id*. We discuss this evidence below.

Baker's affidavit supporting the Department's first amended petition was admitted into evidence, and it recounts that Father told Baker that Mother and Grandmother hid the children from him and that they went so far as to change Older Daughter's name to keep Father from finding Mother or the children. Father testified that he did not see the children from 2007 to 2020. The trial judge could credit this evidence and could reasonably conclude that Mother endangered the children's well-being by concealing them from their father and preventing him from having contact with them. *Cf. In re D.S.B.*, No. 05-14-00950-CV, 2016 WL 4436377, at *4 (Tex. App.—Dallas Aug. 22, 2016, no pet.) (mem. op.) ("A strong presumption exists that the best interest of a child is served by keeping the child with the natural parent . . . .").

---

[1] A conservatorship worker also testified in conclusory fashion that Mother "was aware" of the fact that she had left the children with Grandmother where they were "traumatized over and over again with abuse." But the worker did not explain how she knew this, and she admitted on cross-examination that Mother had not admitted that she was aware of the abuse. So the worker's testimony suggesting that Mother was aware of the children's abuse has an uncertain foundation, and we do not rely on it in our analysis.

Moreover, as our sister court recently explained, neglect can be as dangerous to a child's well-being as abuse, and a parent's "prolonged lack of contact or absence from a child's life qualifies as endangering conduct." *In re A.J.A.D.*, No. 01-22-00521-CV, 2022 WL 17813763, at *7 (Tex. App.—Houston [1st Dist.] Dec. 20, 2022, no pet. h.) (mem. op.). The evidence supports a conclusion that Mother absented herself from essentially the entirety of the children's lives. Baker's affidavit states that in October 2020, Grandmother told Baker that Grandmother had raised all three children since they were babies. The Baker affidavit also recounts the following conversation with Grandmother in December 2020:

> I asked [Grandmother] why [Mother] didn't support her children or have custody of her children. [Grandmother] stated, "I don't know, you tell me." [Grandmother also said,] "All I know is I have had these children all of their lives." . . . I asked [Grandmother] how she could lack so much relevant information regarding her daughter and the care of all [the] children since [Mother] has a lengthy history with the Department. [Grandmother] stated she doesn't know anything about her daughter.

Baker's affidavit also recites that when she visited I.W. in January 2021, I.W. advised that she had been the sole support for Older Daughter, who had been with I.W. since the previous May.

The children's January 2021 psychiatric evaluations by Dr. Hastings were admitted into evidence. They show that Mother had minimal contact with the children over the years and that this negatively affected the children. Older Daughter's report includes the following passage:

> [Older Daughter] reported she has only seen [Mother] a few times a year, "when she wanted money." . . .
>
> . . . [Older Daughter] reported [that Mother's] absence has bothered her more because she is now aware that [Mother] has other children and is more involved in their lives. [Older Daughter] noted that her resentment about this is the first thing she would tell [Mother] if she had the opportunity.

Hastings states in the report that (1) Older Daughter's functioning was affected by abuse by Grandmother and Granduncle and (2) "[a]dditional problems in her family, including the limited involvement of her biological parents in her life, exacerbate [her] distress."

Son's report recites that Son said he had seen Mother "only a couple times in his life," and he admitted that it sometimes bothered him that Mother was not more involved in his life. Also, "[Son] mentioned that in the past, his grandmother gave his biological mother money, and consequently his grandmother did not have money to buy him things." The report also states that Son "is confused and distressed by the absence of his biological parents in his life."

Younger Daughter's report recites that she said she typically sees Mother about once a year. She also said that Mother does not call her or give her birthday presents. However, she indicated that she thought she had a good relationship with Mother and denied distress about the fact that Mother was not raising her. Nevertheless, the report also states that the absence of Younger Daughter's biological parents was a stressor in Younger Daughter's life.

–19–

Thus, the evidence supports a conclusion that Mother's extended course of conduct in failing to participate in the children's lives and upbringing endangered the children's emotional well-being. *See* FAM. § 161.001(b)(1)(E); *In re A.J.A.D.*, 2022 WL 17813763, at *8 ("Lack of meaningful contact—in and of itself—may be endangering conduct.").

Endangering conduct is also shown by evidence that Mother (1) continued to have virtually no contact with the children after the Department filed this case and (2) failed to take the necessary steps to be reunited with them. *See In re R.B.*, 2021 WL 2943927, at *8–9 (factfinder may consider a parent's post-removal conduct in deciding whether parent's conduct endangered child). According to Baker's affidavit, she spoke to Mother in December 2020 and voiced the Department's concerns about the children. Mother then "yelled, and cursed" at Baker and said that nothing was happening to her children. When Baker told Mother that Baker had spoken with Grandmother about Mother's three younger children, Mother "screamed, 'you are messing up my life,' and disconnected the phone."

Moreover, the initial conservatorship worker for the children in this case testified that she tried to find out whether Mother "was working on any services," and she was unable to verify completion of any of Mother's court-ordered services. The next conservatorship worker on the case had it for about six months. She testified that Mother got dropped from one of her services twice for nonattendance. She also testified that Mother did not submit to any drug tests or give the worker any

proof of employment. Mother never asked that conservatorship worker for help or instructions on starting any of her services, and she never asked the worker to set up a visit with the children. Additionally, Son's CASA testified that she tried to contact Mother ten times during the several months before trial, and Mother responded only twice, the second time being the day before trial. Other evidence showed that Mother attempted to contact the children through social media, contrary the court's instructions.

Thus, the evidence supports a conclusion that Mother failed to cooperate with the Department and failed to participate in the services she needed to complete in order to preserve her relationship with the children. This further supports the finding of endangerment. As our sister court has said, "a parent's voluntary failure to engage in or complete services can constitute evidence of child endangerment, particularly to the extent the parent's failure to do so indicates that past endangering conduct remains unaddressed and is likely to persist in the future." *In re A.J.A.D.*, 2022 WL 17813763, at *8. Here, the trial judge could reasonably conclude that the evidence of Mother's conduct during the case's pendency constituted further evidence of endangerment of the children.

In sum, "[a] parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *In re R.B.*, 2021 WL 2943927, at *9. After reviewing all the evidence in the light most favorable to the trial judge's subsection (E) finding and considering any undisputed contrary

–21–

evidence, we conclude that the trial judge could reasonably form a firm belief or conviction that Mother endangered the children's wellbeing or knowingly left the children with someone who endangered the children. Moreover, we conclude that the disputed evidence supporting the finding that a reasonable factfinder could not have credited is not so significant that the trial judge could not have formed a firm belief or conviction that it is true. Thus, we hold that the evidence is legally and factually sufficient to support the trial judge's subsection (E) endangerment finding.

### 4.      Conclusion

We overrule Mother's second issue to the extent it attacks the trial judge's termination finding under § 161.001(b)(1)(E). Because we have concluded that there was sufficient evidence to support termination under subsection (E), we need not address the sufficiency of the evidence to support the findings under subsections (D) and (O). *See In re L.J.H.*, No. 05-21-00183-CV, 2021 W: 4260769, at *14 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.). Accordingly, we do not address the remainder of Mother's second issue (regarding subsection (D)) or her first issue (regarding subsection (O)).

## C.      Issue Three: The Best-Interest Findings

In her third issue, Mother argues that the evidence is legally and factually insufficient to support the trial judge's findings that terminating her relationships with the three children involved in this case was in the children's best interest. *See* FAM. § 161.001(b)(2). In her argument, Mother focuses on the lack of evidence that

she directly harmed the children and the presumption that a child's best interest is served by remaining with a natural parent. She also asserts that there is no evidence that termination of her rights was better for the children than a less drastic remedy.

### 1. Applicable Law

The best-interest element is child-centered and focuses on the child's wellbeing, safety, and development. *In re R.B.*, 2021 WL 2943927, at *12. The factfinder may consider the following factors as relevant to the best-interest determination:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). Family Code § 263.307(b) lists additional best-interest factors, which include (1) the child's age and physical and mental vulnerabilities, FAM. § 263.307(b)(1); (2) whether there is

a history of abusive or assaultive conduct by the child's family or others who have access to the child's home, *id*. § 263.307(b)(7); (3) whether the child's family is willing and able to seek, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision, *id*. § 263.307(b)(10); and (4) whether the child's family demonstrates adequate parenting skills, *id*. § 263.307(b)(12).

These factors are not exhaustive, and a best-interest finding need not be supported by evidence of every factor. *See In re R.B.*, 2021 WL 2943927, at *13. The same evidence can be relevant to both § 161.001(b)(1) termination grounds and the child's best interest. *Id*. There need not be evidence of every factor, particularly if the evidence was undisputed that the parental relationship endangered the child's safety. *Id*. Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

### 2. The Evidence Is Sufficient to Support the Best-Interest Finding

#### a. The Children's Ages, Vulnerabilities, Needs, and Desires

At the time of trial, February 2022, the children were fourteen, fifteen, and sixteen years old.

As for the children's desires, Dr. Hastings testified that Older Daughter seemed to indicate that she wanted to have a relationship with Mother, but she was

conflicted about it. Son and Younger Daughter did not mention that they would like to visit with Mother. The children's initial conservatorship worker testified that every month she asked the children about visits with Mother, and they consistently did not want such visits. The CASA for the two girls testified that the girls told her that they did not have an interest in seeing Mother. The same CASA testified that Son and Younger Daughter told her that they want to live with I.W. and are happy there. Similarly, Son's CASA testified that Son expressed that he did not care to have any contact with Mother. On the other hand, Mother points out that Dr. Hastings testified that Older Daughter said she wanted to talk to Mother, albeit to "tell her she had resentment." And Dr. Hastings testified that Younger Daughter said she prayed for Mother and thought she had a good relationship with her.

There is evidence that all three children have significant vulnerabilities and needs. There is evidence that Older Daughter has suffered from suicidal ideations and has cut herself in the past. Dr. Hastings opined in her report that Older Daughter "is severely depressed and is experiencing active and severe symptoms of trauma." There is evidence that Son suffers from diabetes that was sometimes uncontrolled before the Department intervened. There is also evidence that Son has attempted to commit suicide. Dr. Hastings opined in her report that Son "is experiencing anxiety and depression." The evidence indicates that Younger Daughter's mental health was better than her siblings', but Dr. Hastings still diagnosed her with "Unspecified Trauma- and Stressor-Related Disorder."

We see no evidence that Mother is willing or able to address the children's needs and vulnerabilities, and the evidence of her virtual absence from their lives supports the premise that she is unwilling or unable to help them in that regard.

We conclude that, on the whole, these factors support the trial judge's best-interest finding.

### b.      Parental Abilities and Programs to Assist Parents

We see no evidence that Mother has the parental abilities or skills to raise the children. There is ample contrary evidence, such as the evidence that she abandoned them in their infancy to be raised by Grandmother and the evidence that there have been multiple reports to the Department that Mother is neglecting the younger children that have been in her care. Moreover, there is evidence that on one occasion Mother told a conservatorship worker that she did not understand why the children had been removed from Grandmother or why they could not go back to Grandmother. Mother's willingness to return the children to an abusive environment shows that her parental abilities are lacking. Additionally, there is evidence that Mother improperly tried to contact the children through social media, despite a court order requiring her to arrange all contact with the children through the Department.

Although various witnesses testified to their efforts to help Mother take advantage of services to improve her parental abilities, the evidence showed that Mother consistently failed to do so.

Thus, these factors support the trial judge's best-interest finding.

### c. The Plans for the Children and the Stability of the Proposed Placement

Mother adduced no evidence of her plans for the children. As noted above, there is evidence that on one occasion Mother told a conservatorship worker that she did not understand why the children had been removed from Grandmother or why they could not go back to Grandmother. This suggests that Mother is willing to return the children to an abusive environment.

The children's current conservatorship case worker testified that I.W. was doing a very good job of caring for Son and Younger Daughter and that I.W. was able to do so on a permanent basis. The Department planned to have Older Daughter also stay with I.W. after she left the treatment center she was currently staying at, if certain juvenile charges against her were worked out. The Department would probably eventually look into making I.W. the children's permanent managing conservator.

The CASAs for the children testified that they should continue in their current placements.

Even if the Department's plans for Older Daughter are not entirely clear, we conclude that the evidence of these factors, on balance, supports the trial judge's best-interest finding. *See In re T.A.S.*, No. 05-15-01101-CV, 2016 WL 279385, at *5 (Tex. App.—Dallas Jan, 22, 2016, no pet.) (mem. op.) (noting that lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor regarding best interest).

**d.      The Parent's Acts and Omissions and Any Excuses for Same**

A parent's acts or omissions that indicate the existing parent–child relationship is not a proper one weigh in favor of termination. *In re R.B.*, 2021 WL 2943927, at *12. Here, the evidence shows that Mother has virtually no relationship with the three children because she essentially abandoned them to be raised by Grandmother when the children were infants. There is no evidence of any excuse for Mother's behavior, although an affidavit by Department investigator Baker recites that the Department received allegations at various times after the children's births that Mother was homeless, had a history of leaving her other children alone and unsupervised, had a history of cocaine and marijuana use, and was a heavy alcoholic.

We conclude that the evidence of these factors supports the trial judge's best-interest finding.

**e.      History of Abusive or Assaultive Conduct by the Children's Family**

We have already discussed above the evidence that the children were physically abused by Grandmother and sexually abused by Granduncle. This factor supports the trial judge's best-interest finding.

**3.      Conclusion**

After reviewing all the evidence in the light most favorable to the trial judge's best-interest findings and considering any undisputed contrary evidence, we conclude that the trial judge could reasonably form a firm belief or conviction that the best interest of all three children would be served by terminating Mother's

parent–child relationships with them. Moreover, we conclude that the disputed evidence supporting the findings that a reasonable factfinder could not have credited is not so significant that the trial judge could not have formed a firm belief or conviction that it is true. Thus, we hold that the evidence is legally and factually sufficient to support the trial judge's best-interest findings.

## IV. OTHER ISSUES

**A. Issue Four: Did the Department deprive Mother of her rights by failing to prioritize and provide services toward reunification of each child with Mother?**

In her fourth issue, Mother complains that the Department violated certain Family Code provisions over the course of this case. Her argument is not entirely clear, but she asserts the following specific alleged violations:

- The Department must consider permanency goals with family reunification being the top priority and goal, unless a court determines that reunification efforts are not necessary due to aggravating circumstances. *See* FAM. § 262.2015. Here, the court did not make such a finding, but the Department did not make the required efforts towards reunification.

- Mother was not provided with services narrowly tailored to the allegations in this case and aimed at giving her an opportunity to be reunited with her children. *See id*. §§ 262.407, 262.410.

- The only services ordered in this case concerned a suitable residence, a job, and completing a parenting course and psychological evaluation. The Department never told Mother that her housing or job were inadequate in any hearings or conferences.

- No evidence was presented that the Department made efforts to return any child to either parent, even though the children were already separated in placements.

Mother, however, cites no statutes, cases, or other authorities supporting the premise that any of these alleged violations presents a basis for reversing a termination under § 161.001(b)(1)(E). Nor does she present any argument explaining how any of these alleged violations probably caused an improper judgment in this case or probably prevented her from presenting her case on appeal. *See* TEX. R. APP. P. 44.1 (defining reversible error in civil cases); *Brown v. Frontline Asset Strategies*, No. 05-21-00207-CV, 2022 WL 1421040, at *2 (Tex. App.—Dallas May 5, 2022, no pet.) (mem. op.) (appellant bears the burden of showing harm resulting from error).

Moreover, to the extent Mother complains that any temporary orders in this case were erroneous because they required her to complete inappropriate services, those complaints have been mooted by the final judgment. *See In re B.W.S.*, No. 05-20-00343-CV, 2022 WL 2712494, at *4 (Tex. App.—Dallas July 13, 2022, no pet.) (mem. op.) ("It is well-settled that a temporary order is superseded by entry of a final order, rendering moot any complaint about the temporary order.").

For these reasons, we overrule Mother's fourth issue.

**B.    Issues Five and Six: Whether Mother was wrongfully prohibited from appearing at trial and whether her counsel was ineffective.**

In issues five and six, which she argues together, Mother contends that (1) the trial court erred by proceeding to trial in Mother's absence and (2) to the extent this issue is forfeited because Mother's counsel did not move for a continuance, counsel was ineffective. We overrule these issues for the following reasons.

First, issues five and six are inadequately briefed because Mother's argument (which is only one page long) contains no citations to legal authority as required by Texas Rule of Appellate Procedure 38.1(i). Thus, the issues are forfeited. *See Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.—Dallas 2010, no pet.) ("If we are not provided with existing legal authority that can be applied to the facts of the case, the brief fails.").

Second, issue five was not preserved in the trial court. With respect to Mother's absence from trial, the reporter's record shows that at the beginning of the trial, the judge asked the attorneys if they knew how close Mother and Father were to arriving at the courthouse, and the State's attorney said, "Father just reported that he is on [Highway] 75. . . . And I believe Mom reported to her attorney 30 minutes and that was maybe 10 minutes ago." Mother's attorney did not correct this statement. Later, the judge noted on the record that it was 11:18 and Mother still had not arrived. After a lunch break, Mother's attorney said that she had communicated with Mother and discovered that Mother was actually in Tyler, Texas, and was still waiting on a ride to take her to the courthouse. She further related that Mother said she could not join the trial by Zoom because she was using a flip phone that did not have an internet connection. The judge asked if Mother could call in. Mother's attorney replied, "I asked her if she could do that and she said no. She wants to be here in person." Mother's absence was not mentioned again. Mother's attorney did not object to the trial's going forward without Mother, nor did she move for a

continuance. Thus, no error was preserved as to the trial's going forward in Mother's absence. *See* TEX. R. APP. P. 33.1(a)(1).

Mother's ineffective-assistance complaint raised in issue six can be raised for the first time on appeal. *See In re A.F.*, No. 05-17-00392-CV, 2017 WL 4116945, at *5 (Tex. App.—Dallas Sept. 18, 2017, no pet.) (mem. op.). Mother bears the burden of showing that her counsel's performance was deficient and that the deficient performance prejudiced her. *See In re M.P.B.*, No. 05-22-00399-CV, 2022 WL 4128926, at *4 (Tex. App.—Dallas Sept. 12, 2022, pet. denied) (mem. op.). A party is prejudiced if there is a reasonable probability that the result of the proceeding would have been different but for counsel's unprofessional errors. *Id.*

We conclude that the record does not show that Mother's attorney's performance was deficient. "We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for her actions." *In re Z.M.R.*, 562 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Here, the record is silent as to any reasons counsel may have decided not to request a continuance.

We also conclude that the record does not show prejudice from counsel's failure to move for a continuance. The record furnishes no reason to believe that the trial judge would have granted such a motion, that the denial of such a motion would have been reversible error, or that a later trial would have resulted in a different

judgment. Accordingly, even if we overlook Mother's inadequate briefing of her ineffective-assistance complaint, we reject it on the merits.

For these reasons, we overrule Mother's fifth and sixth issues on appeal.

## V.  DISPOSITION

We affirm the trial court's judgment.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

220954F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF T.J., W.J.
AND T.J., CHILDREN

No. 05-22-00954-CV

On Appeal from the 199th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 199-30035-
2021.
Opinion delivered by Justice Garcia.
Justices Pedersen, III and Breedlove
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 14th day of February 2023.