**Affirmed and Opinion Filed December 22, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00667-CV**

## IN THE INTEREST OF A.B., A CHILD

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. FA-22-0775**

## MEMORANDUM OPINION

Before Justices Nowell, Goldstein, and Breedlove
Opinion by Justice Nowell

This appeal involves the parental termination rights of both Mother and Father to A.B. In a single issue, Father argues the trial court abused its discretion by admitting hearsay evidence in violation of Texas Family Code section 104.006. *See* TEX. FAM. CODE ANN. § 104.006. Mother argues the evidence was insufficient (1) to overcome the fit parent presumption, (2) to support termination under Texas Family Code section 161.001(b)(1)(D), (E), (O), and (M), and (3) to support a finding that termination was in A.B.'s best interest. *See id.* § 161.001(b)(2). In a final issue, she contends she received ineffective assistance of counsel. We affirm.

## Background

From 2019 to 2022, the Texas Department of Family and Protective Services (the Department) has conducted seven investigations involving the physical or sexual abuse of four out of five of Mother's children: A.F.G., A.G.F., A.J.F., and A.E.B. Father is A.E.B. and A.B.'s biological father. A.B. is the subject of this parental termination proceeding.

Mother and Father's parental rights to A.E.B. were terminated in a separate proceeding, and this Court affirmed the termination in *In re A.E.B.*, No. 05-23-00134-CV, 2023 WL 4247372, at *1 (Tex. App.—Dallas June 29, 2023, pet. denied) (mem. op.). Because Mother's parental termination in this appeal is based, in part, on the prior termination, a detailed factual summary of the family's history with the Department is necessary.

In 2019, A.F.G., went to school with a black eye and told his teacher Father caused the injury by opening a door when he was standing behind it. The investigation concluded with a finding of "unable to determine." The Department offered services, but Mother and Father declined.

The Department conducted another investigation in 2019 after someone reported Mother left A.J.F. unsupervised in her car while picking up A.G.F. from school. The children did not have car seats, and A.J.F. had a bloody nose. The Department "found reason to believe" neglectful supervision.

In January 2020, the Department investigated and "found reason to believe" A.F.G. was hit with a hanger.

On June 14, 2021, Detective Nathan Hendrickson responded to abuse allegations involving A.F.G., A.G.F., A.J.F., and A.E.B. He observed marks on A.J.F.'s face and back that appeared fresh. A.J.F. indicated he had been struck with cables. Investigators lifted his shirt and observed marks consistent with his statement. His injuries were consistent with those of A.F.G., who also reported being struck with cables. Based on his observations, Detective Hendrickson arranged forensic interviews for A.J.F. (approximately three years old), A.G.F. (approximately five years old), and A.F.G. (approximately eight years old).

Melissa Harris, a forensic interviewer with Grayson County's Children's Advocacy Center, conducted the interviews. All three children provided similar explanations for why they were being interviewed and all three identified Father as the perpetrator. A.J.F. and A.G.F. said Father used a yellow cord or cable to hit them.

Mother denied knowing A.J.F. had other injuries beyond the one on his face. When confronted about the ones on his back, she said something like, "Oh shit, it wasn't me." She provided Detective Hendrickson unsolicited information about cables and blamed A.F.G. for the injures.

The Department "found reason to believe" Father inflicted inappropriate discipline with extension cords on A.J.F. The children were removed from the home, placed in foster care, and Father was charged with injury to a child.[1]

Shortly thereafter, Mother visited the District Attorney's office seeking to fill out an Affidavit of Nonprosecution regarding Father's injury to a child charge; however, the case proceeded. A Zoom hearing was held in which the court entered bond conditions for Father, one of which included no contact with A.F.G., A.G.F., A.J.F., or family members of the children. Mother and Father, along with their attorneys, were present at the Zoom hearing, and a translator translated the proceeding.

On May 11, 2022, Harris interviewed A.G.F. again after a delayed outcry of sexual abuse against Father. A.G.F. described Father touching her vagina with his hand and penis. She described the abuse as "things people do when they're married." She put her legs up over her head and pointed to her vagina as she described the incident. A.G.F. stated she told Mother, but "Mom didn't care." She also said Father took photographs of her without her clothes. A.G.F. said she would be in trouble with Father if she told.

A.B., the subject of this appeal, was born in June 2022. Naquista Arps, an investigator with Child Protective Services (familiar with the family from previous

---

[1] F.G. is the biological father of A.G.F. and A.F.G. The Department placed A.G.F., A.F.G., and A.J.F. with him after removal. A.E.B. was placed in a separate foster home.

–4–

investigations), was assigned to investigate Mother and Father because of concern for A.B.'s well-being based on Mother's past failures to protect her other children or believe their outcries.

Arps visited the home on June 29, 2022. When she arrived, Father was there despite court orders to stay away from Mother and her children. Arps asked Father if he lived there, and he said yes. She asked for how long, and "he just kind of stated that he was there charging something, but wasn't specific about what he was charging." He briefly went into the home, came out with a teenager (later identified as his child by another woman), and then left.

Arps said A.B. looked healthy, and other than Father's presence, she did not observe anything concerning. Mother explained Father was there because he brought A.B.'s half sister to meet her, and he brought "stuff for the baby." Mother denied being in a relationship with Father because "she wanted her children back."

It is undisputed there were no allegations of physical or sexual abuse by either parent regarding A.B. However, because of the extensive CPS history and Mother's failure to protect A.B. as evidenced by continued contact with Father, the Department removed A.B. and placed her in foster care. The Department petitioned to terminate Mother and Father's parental rights to A.B. The Department presented its case during a bench trial, wherein the court heard from many witnesses, including CPS investigators involved in the various investigations, the forensic interviewer, Detective Hendrickson, Mother, and Father.

Mother testified she was twenty-nine years old and from Salvador.[2] She moved to the United States in 2013. Her relationship with Father lasted five years, but they were no longer together. She ended the relationship in May before A.B. was born because "it was the best thing and she wanted her children back." During the past year, she exercised her visitation rights with A.B. and never missed a visit. She felt she had a close, loving relationship with A.B. If the court returned A.B. to her, she would abide by the court order prohibiting contact with Father and provide a home, food, clothing, and safe environment. She worked between thirty-five and forty hours a week at a restaurant making about $500 a week with tips. She also alleged she took over Father's bounce house business, but it was not yet profitable. She disagreed it was in A.B.'s best interest to terminate her or Father's parental rights.

She explained her living situation as follows. About a week before trial, she moved out of an apartment where she had rented a room for about a six months from a woman she "hardly ever talked with." She found that rental in the newspaper. Her new living arrangement was in a two-bedroom home with a man named Salvador. She paid $600 a month to rent one of the bedrooms. She met Salvador when he fixed her car but knew little about him or whether he had a criminal history. If her rights

---

[2] When asked where she was born, Mother answered, "In Salvador." The record does not contain any other information regarding her place of birth, but it is likely she was born in El Salvador, and the reporter's transcription is in error.

were not terminated, she planned for A.B. to live there with her until she found something "good and cheap" in Sherman.

The Department spent a large amount of time questioning Mother about the termination of her parental rights to A.E.B. and her conduct towards the other children. Mother repeatedly testified she did not believe Father caused A.J.F.'s injuries because she never saw Father hit him. Even after the Department asked her "why . . . after all this time, after all that you have lost" did she not believe her children, and she said, "Because I never saw that he would hit them or strike them. I always saw that he would treat them good." She admitted that in the prior termination hearing, she testified she did not believe Father sexually abused A.G.F. She still did not believe it because A.G.F. continued to ask about Father, and Mother believed, "[w]hen someone does something to you, you don't want to see that person." She denied that A.G.F. told her about the sexual abuse. She acknowledged she lost her children, in part, because she did not believe their abuse allegations. The Department asked if she had "taken a strong stand against [her] children's allegations," and she answered, "You could say so, yes." She claimed she ended her relationship with Father because the court told her to but admitted she would allow Father to be part of A.B.'s life with the court's permission.

The Department presented the following evidence regarding Mother's services. Although Mother completed most of them, she did not finish her personal counseling sessions, which were critical in helping her understand the children's

trauma and how to protect them from people that hurt them. Her counselor eventually stopped working with her because she did not believe Mother was making progress. The counselor believed Mother prioritized Father over the children. Mother finished Moral Recognition Therapy, but she could not remember what it was or testify to anything she learned from it. Mother did not pay child support or keep the Department informed of her current address.

Dominique Chavez, the family's conservatorship caseworker, testified Mother and Father seemed to complete only those services that were convenient or desirable, such as visitation. They did not complete services like counseling, which Chavez considered most important because the Department's goal was to change Mother's perspective and behavior regarding the safety of her children.

Chavez testified A.B. was bonded with Mother as much as she could be considering her young age and the two hours a week they spent together. Mother was "mostly" appropriate with A.B., but during one of her weekly visitations, Mother mentioned one instance of A.B. drinking milk. Chavez explained giving milk to a child her age was not appropriate.

Chavez believed Mother needed to show "better protective capacity." Chavez acknowledged Father was in jail and could not endanger A.B., but the Department continued to be apprehensive about Mother's ability and inclination to protect A.B. in the future from other partners based on her refusal to believe her children unless

she personally witnessed abuse. Thus, concern regarding Mother's lack of protective capacity did not end because Father was in jail.

Chavez believed Mother's willingness to separate herself from Father was inconsistent. Despite the court order, Father was at Mother's house shortly after A.B.'s birth. Father at first said he lived there but changed his story after Chavez identified herself. When Father was arrested, he listed Mother as his emergency contact, identified her as his wife, and provided her phone number. Call records from jail indicated thirty-five calls between Mother and Father, and the transaction report for his account showed Mother made six fifty dollar deposits into his account. Visitation records indicated Mother visited Father in jail on May 17, 2023 (one month before this termination trial). They said, "I love you" in several of the phone calls, and they sounded like they were in a relationship.

Mother, however, denied being married to Father. She claimed a friend borrowed her cellphone for some of Father's calls. She said her calls and the one in-person jail visit involved discussions about the bounce house business because he knew all the business details. She testified she no longer needed to talk to him because she now had all the information she needed.

At the time of trial, Father was incarcerated on pending charges of aggravated sexual assault of a child and indecency with a child by sexual contact. He was also under indictment for injury to a child. He testified briefly and gave inconsistent testimony about when he lived with Mother.

The Department believed termination of Mother and Father's parental rights was in A.B.'s best interest. A.B. had been in a foster home for almost a year. She was bonded with her current placement and with A.E.B., who also lived in the home. The family was motivated to adopt. A.B.'s foster family had a good working relationship with the other three children's family, and both families had discussed their willingness to maintain contact among the children.

The trial court signed an order terminating Mother and Father's parental rights to A.B. under family code section 161.001(b)(1)(D), (E), (M), and (O) and found termination was in her best interest. This appeal followed.

## Termination of Father's Parental Rights

In a single issue, Father argues the trial court abused its discretion by admitting hearsay evidence from Melissa Harris, the forensic interviewer, in violation of Texas Family Code section 104.006. *See* TEX. FAM. CODE ANN. § 104.006. The State responds Father failed to preserve his issue in the trial court, and his argument on appeal does not comport with his objection at trial.

Section 104.006 details the procedure for admitting statements of child abuse victims under the age of twelve. *Id.* It states:

> In a suit affecting the parent-child relationship, a statement made by a child 12 years of age or younger that describes alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and:

(1) the child testifies or is available to testify at the proceeding in court or in any other manner provided for by law; or

(2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

*Id.*

Father concedes the testimony is "likely sufficient" to satisfy the reliability requirement of section 104.006 but submits there is no evidence satisfying (1) or (2). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

When the State offered Harris's testimony regarding the children's outcry statements, Father made a hearsay objection. The State acknowledged the "statements are in fact hearsay," but explained the statements could come in if the trial court entered findings under section 104.006 that the statements were reliable and it was in the children's best interest not to testify. Father's counsel then stated, "Well, and if the Court goes along with that position, then what I would say it would have to be very limited or just what the initial outcry is, and that's it. You can't go on and explain and explain." The trial court overruled the objection and stated its findings on the record. Father made no further objection.

Texas Rule of Appellate Procedure 33.1 requires a clear, specific objection to the trial court. Father's only objection to the evidence was hearsay. Based on the record, it was not clear to the trial court Father was challenging either prong of section 104.006. Moreover, issues raised on appeal must comport with objections

and arguments raised to the trial court. *In re D.E.H.,* 301 S.W.3d 825, 827 (Tex. App.—Fort Worth 2009, pet. denied). An objection on appeal that is not the same as that urged at the trial presents nothing for review. *Id.* Because Father made a hearsay objection in the trial court but raises a sufficiency of the evidence to satisfy the conditions of 106.004 on appeal, his appellate issue does not comport with his trial objection. Thus, Father not only waived his issue but also presents nothing for the Court to review. We overrule Father's sole issue.

## Termination of Mother's Parental Rights

Mother argues the evidence was insufficient (1) to overcome the fit parent presumption, (2) to support termination under Texas Family Code section 161.001(b)(1)(D), (E), (O), and (M), and (3) to support that termination was in A.B.'s best interest. In a final issue, she contends she received ineffective assistance of counsel. The Department responds evidence supports at least two statutory termination grounds and the best interest finding. Further, it asserts the record is silent and insufficient to support an ineffective assistance claim.

### *Standard of Review*

The Texas Family Code provides that a court may order termination of a parent–child relationship if the court finds by clear and convincing evidence the parent engaged in conduct prohibited by section 161.001(b)(1) and termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). Because the fundamental liberty interest of parents in the care, custody, and control of their

children is of constitutional dimensions, involuntary parental terminations must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In such cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re J.S.*, 675 S.W.3d 120, 127–28 (Tex. App.—Dallas 2023, no pet.).

On appeal, we apply a standard of review reflecting the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). Under both legal and factual sufficiency standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could reasonably form a firm belief or conviction the grounds for termination were proven. *J.S.*, 675 S.W.3d at 127. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In conducting a legal sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a

reasonable factfinder could do so. *In re J.S.*, 675 S.W.3d at 128. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.* We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

In this case, the trial court found Mother engaged in conduct prohibited by paragraphs (D), (E), (O), and (M) of section 161.001(b)(1), and termination was in the best interest of A.B. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (M) & § 161.001(b)(2). When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other grounds under section 161.001(b)(1). *In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam); *In re N.G.*, 577 S.W.3d at 235.

***Statutory Predicate Acts for Termination***

–14–

We will address each of Mother's arguments, but we begin with her fourth issue, termination under section 161.001(b)(1)(M), because it impacts the analysis of the other statutory predicate acts for termination.

### 1. Subsection (M): Previous Termination of Parental Rights

Termination under subsection (M) may be ordered when the trial court finds by clear and convincing evidence that a parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)." TEX. FAM. CODE ANN. § 161.001(b)(1)(M). Mother contends the trial court's judgment terminating her rights to A.E.B. should not supply the grounds for terminating her rights to A.B. because the earlier case was still in the appellate process during A.B.'s termination trial. According to Mother, it is premature to allow A.E.B.'s termination to prompt termination of her parental rights to A.B. because it could be reversed on appeal.

Mother cites *In re P.W.*, 579 S.W.3d 713, 723 (Tex. App.—Houston [14th Dist.] 2019, no pet.) for support. In that case, the court of appeals concluded a termination order offered to support a subsection (M) finding must be "final by appeal." The court reasoned that subsection (M) would suffer from "a serious doubt as to [its] constitutionality" if the Department could "prove a predicate act based on a termination finding . . . when a court has deleted the finding or reversed the final order *or when a court in a pending appeal might delete the finding or reverse the final order*." *Id.* (Emphasis added).

The First Court of Appeals reached the opposite conclusion in *In re A.C.*, 394 S.W.3d 633, 640 (Tex. App.—Houston [1st Dist.] 2012, no pet.). It reasoned, in part, "finality, in the sense of a complete exhaustion or waiver of all possible appellate remedies, is not expressly required by the text of the statute." The mother's appeal of the prior termination decree did not suspend the effect of that decree. *Id.* Rather, the prior decree effectively terminated her parent-child relationship at the time of the trial, despite the fact the order was still subject to review on appeal. *Id.*; *see also In re R.J.*, 579 S.W.3d 97, 113 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (same).

Here, no party has cited, and research has not revealed, any resolution of this split by the Supreme Court of Texas or any position taken by this Court on the issue. However, we need not address this split because even applying *P.W.*'s more restrictive standard, we conclude the evidence was legally and factually sufficient to support the subsection (M) finding. Not only did the State offer a certified copy of the prior February 6, 2023 termination order, which included findings under subsection (D), (E), and (O), but this Court has also affirmed and issued the mandate in the underlying termination case. *See In re A.E.B.*, 2023 WL 4247372, at *1 (concluding evidence legally and factually sufficient to support termination of Mother's parental rights under subsections (D) and (E) for endangering conduct); *see also e.g.*, *In re B.H.*, No. 01-21-00390-CV, 2021 WL 6067717, at *3 (Tex. App.—Houston [1st Dist.] Dec. 23, 2021, pet. denied) (mem. op.) (concluding

termination of parental rights supported under subsection (M) when court previously concluded in a separate appeal evidence was legally and factually sufficient to support termination of another child). As such, the underlying termination is final. We overrule Mother's fourth issue. In light of this conclusion, we need not address Mother's second issue challenging the trial court's finding under subsection (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Because the legislature recently added a time limit for using subsections (D) and (E) to permit termination under subsection (M), it is theoretically possible that an affirmance of termination under subsection (D) or (E) in this case could extend the availability of a future subsection (M) termination should the Department move to terminate Mother's parental rights to any other children in the near future. Thus, we still have a duty to analyze subsection (D) and (E) in this appeal even though another subsection (D) and (E) termination exists in Mother's past. *See In re N.G.*, 577 S.W.3d at 237; *see also* TEX. FAM. CODE ANN. § 161.001(d-1) (limiting length of time a subsection (D) or (E) termination supports a subsequent subsection (M) termination). We first consider the trial court's subsection (E) finding.

## 2. Subsection (E): Endangering Conduct

Subsection (E) provides for termination of parental rights if the parent has "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Within the context of subsection (E), endangerment encompasses "more than a threat of metaphysical

–17–

injury or the possible ill effects of a less-than-ideal family environment." *In re I.T.*, No. 01-18-01013-CV, 2019 WL 1996515, at *8 (Tex. App.—Houston [1st Dist.] May 7, 2019, no pet.) (mem. op.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*

It is unnecessary to establish a parent intended to endanger a child to support termination under subsection (E). *Id.* Nor is it necessary to establish the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *Id.* Danger to a child's well-being may be inferred from parental misconduct. *Id.*; *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Endangering conduct does not have to occur in the child's presence. *In re K.P.*, 498 S.W.3d at 171. A parent's past endangering conduct may create an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *Id.*; *see also In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re I.T.*, 2019 WL 1996515, at *8 (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Mother spends most of her brief arguing there is no evidence she engaged in any endangering behavior towards "this child" or that Father had any opportunity to

abuse "this child." She asserts she made good faith efforts to complete, and did complete, most of her court-ordered services; she has income and a stable residence; no one told her or she did not understand Father's court order to stay away from the children included A.B.; and there is substantial evidence she is separated from Father and understands the need to stay away from him.

Mother continues to ignore how her conduct, including her past acts, omissions, or failures to act, endangers A.B. She refuses to believe her children's abuse allegations against Father even after termination of her parental rights to A.E.B. She testified she did not believe the allegations because she never saw Father abuse the children but only saw "he would treat them good." She testified she did not believe Father sexually abused A.G.F. because she never told her. Mother believed if the abuse happened, A.G.F. would have told her right away. The Department shared its concern that Mother failed to show any "improved protective capacity," an important goal of her individual therapy. Despite completing her Moral Recognition Therapy, Mother could not remember anything about the sessions or testify to anything she learned.

Although Mother testified she had stable employment and explained her current living arrangement, she also admitted she knew little about the man she was living with and likewise knew little about the woman she previously lived with for six months. The court could consider Mother's casual approach to investigate

–19–

individuals with whom she lives as another indicator of a lack of protective instincts relating to herself and A.B.

To the extent Mother asserts there is substantial evidence she is separated from Father and understands the need to stay away from him, we disagree. Mother continued contact with Father not only while charges were pending in the physical abuse case against A.J.F. (and even sought to have the charges dropped), but also after Father was arrested for sexually abusing A.G.F. She visited Father in jail, deposited money in his account, and participated in numerous phone calls with him. They said, "I love you" during these calls, and Chavez believed they were still in a relationship. Mother testified she would keep Father away from A.B., but only on the court's instruction.

The court was free to disbelieve Mother's testimony that she only interacted with Father because she needed to learn about his bounce house business. The court was also free to disbelieve her assertions she did not know Father's court order to stay away from the children extended to her and A.B. Mother and Father, along with their attorneys, were present at a Zoom hearing, and a translator translated the proceeding in which the bond conditions were explained.

Instead of keeping Father away from A.B., there was testimony he still lived with Mother after A.B.'s birth. Chavez continued seeing some of Father's property outside the home in July 2022. Father himself testified he lived with Mother "after my daughter was born" but then said, "I mean, like right before my baby was born."

Subsection (E) termination must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by a parent. *In re A.E.B.*, 2023 WL 4247372, at *6. A parent's steadfast refusal to believe a child's outcry and meaningfully limit the alleged abuser's access demonstrates a pattern of conduct endangering the child's physical or emotional well-being. *See In re M.H.*, No. 05-22-00017-CV, 2022 WL 3135919, at *6 (Tex. App.—Dallas Aug. 5, 2022, no pet.) (mem. op.) (concluding mother's steadfast refusal to believe child's outcry despite allegations of father's previous inappropriate sexual conduct with other family members, which were true, endangered child's well-being). Mother's voluntary, deliberate, and conscious acts constitute more than a single act of conduct. On this record, the trial court could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered A.B.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Accordingly, the evidence is legally and factually sufficient to support parental termination under subsection (E). We need not address whether the evidence also supports termination under subsection (D). TEX. R. APP. P. 47.1; *In re M.H.*, 2022 WL 3135919, at *6 n.5.

### Best Interest

Mother next argues the evidence is legally and factually insufficient to support the trial court's best interest finding. TEX. FAM. CODE ANN. § 161.001(b)(2). Whether termination of parental rights is in a child's best interest is "child centered,"

–21–

and the inquiry focuses on "the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Proof concerning the statutory predicate findings under section 161.001(b)(1) does not relieve the Department of its burden of proving termination is in the child's best interest, but "the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28. And, although there is a strong presumption that maintaining the parent-child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. Tex. Fam. Code Ann. §§ 153.131, 263.307(a).

The best-interest analysis may consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.); *see also In re S.V.H.*, No. 01-19-01003-CV, 2020 WL 2988567, at *7 (Tex. App.—Houston [1st Dist.] June 4, 2020, pet. denied) (mem. op.). "A trier of fact may measure a parent's future conduct by her past conduct and determine whether termination of parental rights is in the child's best interest." *In re B.R.*, 456 S.W.3d at 616; *see In re C.H.*, 89 S.W.3d at 28 (stating past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis).

The Texas Supreme Court has set out several non-exclusive factors we should consider when determining whether termination of parental rights is in the child's

best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and it is not necessary the Department prove all of these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the child's best interest. *In re A.C.*, 394 S.W.3d at 642.

Although there is evidence suggesting Mother and A.B. are bonded, we must weigh that against the danger of Mother's steadfast refusal to believe her children's outcries despite clear and convincing evidence of Father's abuse and evidence suggesting Mother was aware but indifferent to the abuse. The Department repeatedly expressed its concern that Mother would not protect A.B. from harm from future partners based on her prior conduct and failure to exhibit any genuine change in her beliefs and behaviors. Further, there was testimony A.B., who has lived with her foster family for almost a year, is bonded with the family. The family is adoption

–23–

motivated, and A.B.'s sibling, A.E.B., is also currently placed in the home. A.B.'s foster family has a good working relationship with the other three children's foster family. Both foster families have discussed their willingness to keep the children in contact. On this record, the trial court could have formed a firm belief or conviction that termination was in A.B.'s best interest. We overrule Mother's fifth issue.

### *Fit Parent Presumption*

In her first issue, Mother argues the evidence was insufficient to overcome the fit parent presumption and the constitutional rights afforded to her. Mother appears to argue the fit parent presumption is a separate hurdle the Department must overcome independently and in addition to establishing both prongs of section 161.001(b) by clear and convincing evidence.

Mother cites *In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) for support. In that case, the Texas Supreme Court recognized parents enjoy a presumption they are fit and able to make decisions regarding their children unfettered by government intrusion. *Id.* at 808. The court clarified a constitutional—as opposed to statutory— parental presumption applies in modification proceedings where the original order appointed at least one parent as the child's managing conservator. *Id.* at 816–19; *see also Interest of R.L.*, No. 04-23-00101-CV, 2023 WL 4610065, at *2 (Tex. App.— San Antonio July 19, 2023, no pet.) (mem. op.); *see also Interest of J.O.L.*, 668 S.W.3d 160, 164 (Tex. App.—San Antonio 2023, pet. filed) (recognizing prior to

*C.J.C.*, parental presumption applied only to family code section 151.131 and 153.433 but court expanded it to modification proceedings in *C.J.C.*).

Since the court's holding in *C.J.C.*, the vast majority of cases cite the case as authority for the application of the fit parent presumption in modification suits, not termination suits. The few termination cases relying on *C.J.C.* for the presumption discuss the holding within the overall review of the evidence supporting termination under the heightened burden of clear and convincing evidence. *See., e.g.*, *In re C.R.*, No. 02-23-00331-CV, 2023 WL 6461999, at *6 n.7 (Tex. App.—Fort Worth Oct. 4, 2023, no pet.) (mem. op.) ("The Family Code must always yield to [the fit parent] presumption because it is of due-process, constitutional dimension . . . it should be a consideration (and is) in termination cases such as the one here."); *Interest of E.L.H.*, No. 13-22-00192-CV, 2022 WL 3652497, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 25, 2022, no pet.) (mem. op.) (citing *C.J.C.* but conducting sufficiency review of best interest finding under elevated clear and convincing standard of review without separate discussion of "fit parent presumption"); *Interest of E.D.E.L.*, No. 05-22-00103-CV, 2022 WL 2383797, at *10 (Tex. App.—Dallas July 1, 2022, no pet.) (mem. op.) (citing *C.J.C.* within section 161.001(b)(1)(D), (E) analysis).

Assuming the fit parent presumption applies in termination proceedings, it is not absolute and may be rebutted. *See In re C.D.C.*, No. 05-20-00983-CV, 2021 WL 346428, at *1 (Tex. App.—Dallas Feb. 2, 2021, no pet.) (mem. op.). As extensively

discussed above, the trial court could have formed a firm belief or conviction Mother engaged in a course of conduct that endangered A.B.'s physical or emotional well-being and termination of her parental rights was in A.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (b)(2). To assert Mother's "sole transgression" was not having actual or constructive notice of Father's bond conditions is unsupported by the record but also a myopic view of the evidence as a whole.

We recognize a parent has a constitutional right to the care, custody, and control of her child. *In re J.W.*, 645 S.W.3d 726, 740 (Tex. 2022); *In re C.J.C.*, 603 S.W.3d at 811. And when the government seeks not only to infringe on this fundamental right, but to terminate the right altogether, such termination is considered "traumatic, permanent, and irrevocable" and "constitutes the 'death penalty' of civil cases. *In re J.C.H.-P.*, 673 S.W.3d 262, 264 (Tex. App.—San Antonio 2023, no pet.). However, under the facts of this case, the Department overcame the fit parent presumption and Mother has not shown she was denied any other constitutional due process. We overrule Mother's first issue.

**Ineffective Assistance of Counsel**

In her sixth issue, Mother argues she received ineffective assistance of counsel. Specifically, Mother complains there was an "overarching language barrier" preventing her from communicating with her attorney, which prevented him from preparing her defense. She further challenges counsel's failure to object to the

irrelevant and prejudicial evidence regarding the abuse of her other children. She argues she suffered egregious harm because without that evidence, the Department had no evidence of neglect or abuse. Finally, she asserts counsel acted ineffectively by failing to request the return of A.B. to her at any point throughout the case.

In parental termination cases, a review for ineffective assistance of counsel encompasses the standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984); *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). First, Mother must show counsel's performance was deficient. *Id.* at 687. This requires showing counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the parent by the Sixth Amendment. *Id.* Second, the parent must show the deficient performance prejudiced the defense. *Id.* This requires showing counsel's errors were so serious as to deprive Mother of a fair trial. *Id.*

To establish an ineffective assistance claim, Mother must successfully establish both *Strickland* prongs. *In re M.S.*, 115 S.W.3d at 545. Further, an allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for the actions. *In re Z.M.R.*, 562 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

–27–

With respect to whether counsel's performance in a particular case is deficient, we must consider all of the circumstances surrounding the case and must focus primarily on whether counsel performed in a "reasonably effective" manner. *Id.* The Court of Criminal Appeals explained counsel's performance falls below acceptable levels of performance when the "representation is so grossly deficient as to render proceedings fundamentally unfair . . . ." *Id.* In this process, we must give great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," including the possibility counsel's actions are strategic. *Id.* It is only when "the conduct was so outrageous that no competent attorney would have engaged in it," that the challenged conduct will constitute ineffective assistance. *Id.*

Mother cites to one portion of her testimony in which she explained she and counsel used "text to translate" to communicate, and they had some confusion in their conversations. However, the record does not establish an "overarching language barrier." To the contrary, Mother testified she adequately communicated with counsel during the case even though it "cost us a little bit of work." She understood the case and knew the State was asking to terminate her parental rights. When asked if there was something she felt like she was unable to adequately discuss with her attorney, she said, "No." Thus, Mother has not overcome the strong presumption that counsel's conduct fell within the wide range of reasonable

professional assistance despite their language differences. Mother has not satisfied the first *Strickland* prong for this argument.

The record is silent as to counsel's strategy for not objecting to the evidence of neglect regarding the other children. Consequently, it is impossible to determine whether the alleged failures were matters of strategy or competency. *In re M.G.*, No. 14-09-00136-CV, 2009 WL 3818856, at *11 (Tex. App.—Houston [14th Dist.] Nov. 17, 2009, no pet.) (mem. op.). Indeed, matters of omission, such as the alleged conduct here, are particularly ill-suited for review on direct appeal where counsel's reasoning has not been developed in the record. *Id.* Because the record is silent on these matters, Mother cannot overcome the presumption that counsel's performance was competent. *Id.* Regardless, counsel could have reasonably concluded any objection would have been overruled because evidence of prior acts or omissions of a parent are often admitted in parental termination cases. *See* TEX. FAM. CODE ANN. § 161.001(b)(M); *see also Holley*, 544 S.W.2d at 372 (considering acts or omissions of parent that may indicate the parent-child relationship is not proper); TEX. FAM. CODE ANN. § 161.001(b)(M); *see also Carranza v. State*, No. 08-16-00298-CR, 2019 WL 2205665, at *15 (Tex. App.—El Paso May 22, 2019, pet. ref'd) (not designated for publication) ("because the evidence complained of was admissible, he has failed to demonstrate deficient performance by his trial counsel").

Similarly, the record is silent as to why counsel did not request the return of A.B. during the case. Thus, the alleged conduct is ill-suited for review on direct

appeal without a developed record. *In re M.G.*, 2009 WL 3818856, at \*11. Because

Mother has not satisfied *Strickland*, we overrule her sixth issue.

## Conclusion

We affirm the trial court's order terminating Mother and Father's parental

rights to A.B.

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE

230667f.p05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF A.B., A CHILD

No. 05-23-00667-CV

On Appeal from the 397th Judicial District Court, Grayson County, Texas
Trial Court Cause No. FA-22-0775.
Opinion delivered by Justice Nowell. Justices Goldstein and Breedlove participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of December, 2023.